# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7822 | **DATE** | 2/10/2003 |
| **CASE TITLE** | Midwest Ink Company vs. Graphic Ink Systems, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   ENTER MEMORANDUM OPINION AND ORDER: Defendant David Scott's motion for reconsideration of summary judgment ruling is granted and the court's summary judgment ruling of March 29, 2001 is hereby vacated. Defendant's motion for sanction is denied. STATUS HEARING SET FOR 2/26/03 at 9:30a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | 40 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | TBK | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice<br><br>mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MIDWEST INK COMPANY, )<br>)<br>Plaintiff- )<br>Counter defendants, )<br>)<br>v. )<br>)<br>GRAPHIC INK SYSTEMS, and )<br>DAVE SCOTT, )<br>)<br>Defendant- )<br>Counter plaintiffs. )<br>) | No. 98 C 7822<br><br>Judge Ronald Guzman |

## MEMORANDUM OPINION AND ORDER

Defendant, David Scott brings a Motion for Reconsideration of Summary Judgment Ruling and a Motion for Sanctions. Previously this court granted plaintiff's motion for summary judgment against defendant David Scott pursuant to Fed. R. C. P.56. The plaintiff's claim, upon which the summary judgment was granted, is two-fold. First, the plaintiff alleges that the defendant was an employee and not an independent contractor with Midwest Ink. Secondly, the plaintiff maintains that as an employee, the defendant committed several acts which were in breach of his fiduciary responsibility to his employer and thus he is liable for those breaches. In his motion for reconsideration defendant cites cases not previously considered by the court.



## FACTS

The following information is taken from the record provided by the respective parties. Plaintiff Midwest Ink Co., a privately owned company, is generally engaged in the manufacturing and sale of ink products to commercial printers in Illinois and Wisconsin. The defendant, Dave Scott, was formerly a salesman for the plaintiff from August 1994 until he was terminated in June of 1998.

Prior to working for the plaintiff, the defendant and his father, Jim Scott, sold ink for other companies. However, in August of 1994, the defendant and his father approached the president of Midwest Ink, Frank Hannon, to discuss opportunities with the company. Based on those discussions, both the defendant and his father entered into an agreement with Midwest Ink in which they agreed verbally to be commissioned salesmen for the company and receive a 15 percent commission on the sales they made. The defendant was assigned to handle sales in Wisconsin and his father was responsible for a territory in Illinois. From the outset, it appears undisputed that it was understood by both the Scott's and Midwest Ink's management that either party was free to terminate the relationship between them at any time for any reason.

Although Jim Scott was an experienced salesman, his son was newer to the sales field. As such, Hannon, president of Midwest Ink, testified that he provided the defendant with several names of customers in Wisconsin with whom the company had already previously developed a business relationship. Additionally, Hannon testified that he accompanied the defendant on seven or eight sales calls during his first year and a half with the company, providing assistance and guidance on sales. By all accounts, the defendant was becoming a stronger salesman during those initial months and his gross revenue for the company increased steadily.

2

In February of 1995, the Midwest Ink revised their employment contract with the defendant per his request. As part of their new arrangement, Hannon agreed to provide the defendant with health insurance, a car for business including its insurance and maintenance costs, and Midwest Ink agreed to carry worker's compensation insurance on the defendant. Additionally, the defendant mentioned he wanted to have an ink manufacturing plant opened in Wisconsin in hopes that having a plant locally would help increase overall sales for the territory. Hannon agreed to his request and financed the costs of setting up the manufacturing plant and setting up a satellite office for the defendant to conduct business which was near his home in Wisconsin.

As part of their employment arrangement, the plaintiff paid all of the costs of the satellite office in Wisconsin. The rental agreement for the office space listed "Midwest Ink" as the tenant as did the building occupancy certificate. Furthermore, the plaintiff paid the monthly rent for the space, all certification costs for the building with the city, all telephone and utilities costs, and for all office supplies connected with the operation of the defendant's office. Additionally, the plaintiff bought the defendant a company car for business. The company paid for major maintenance costs and insurance connected with that vehicle. The defendant was only responsible for fuel and minor maintenance costs.

The defendant's W-2 forms for 1995-1997 indicate that the only income he reported was that from Midwest Ink. Those W-2 forms list deductions by the plaintiff for the defendant's workers compensation coverage, FICA, and health insurance. The defendant received health coverage for himself and his wife under the company's insurance provider and his name was specifically listed on the plaintiff's employee roster which was given to the company's health

3

carrier for coverage information. (Exh. 27) In his application for health insurance, the defendant specifically signed a declaration that he was an "employee" of Midwest Ink and listed his employer as such. (Exh. 22)

In January of 1998, without the plaintiff's knowledge, the defendant's wife, Toni Scott, formed a corporation called Graphic Ink Systems. As president of the company, Mrs. Scott testified that the company initially only sold ink products but after a few months, she purchased some mixing equipment and began manufacturing ink as well. (T. Scott Dep. 31) Mrs. Scott testified, and the defendant stated in his pleadings that he was not an agent or officer of Graphic Ink Systems, but merely a salesman for them at the same time that he was working for the plaintiff. However, in his solicitation letters to customers on behalf of Graphic Ink, his wife's newly formed corporation, the defendant noted his title as "President." (Exh. 41) Although the defendant did not received any fringe benefits from the company and was paid solely on a commission, he did have access to the company bank account as a signatory.

Hannon testified that he noticed a drop in the defendant's sales From January 1998 through June 1998. He confronted the defendant about this observation and was assured by him that his "customers were just slow, or were trying a competitor's ink." (Exh. 28) Neither Hannon, nor any other member of Midwest Ink's management was aware of the defendant's involvement with Graphic Ink Systems during that time. It was only after Hannon contacted one of his customers that he learned that the defendant had been selling them ink from Graphic Ink Systems. Further investigation revealed that a number if not all of Graphic Ink Systems customers were former customers of Midwest Ink and were still operating through the defendant as their supplier of ink products. When Hannon confronted the defendant with this information,

4

the defendant testified that he told him that he was a "broker" and not an employee of Midwest Ink and thus free to sell independently for anyone. Hannon disagreed and on June 29, 1998, the plaintiff terminated the defendant's employment with Midwest Ink. This suit was commenced shortly thereafter.

## **DISCUSSION**

Under FED.R.CIV.P. 56(c), a court should grant a summary judgement motion if "there is no genuine issue of material fact and ...the moving party is entitled to judgement as a matter of law." The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.PRO. 56(c).

The opposing party must set forth specific facts, through affidavits or other materials, that demonstrate disputed material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986). When reviewing a summary judgement motion, the court must read the facts in a light most favorable to the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 256. The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7thCir. 1994).

Under Illinois law, the "existence and scope of an agency relationship are questions of fact, to be decided by the trier of fact," unless the relationship is "so clear as to be undisputed." *Rankow v. First Chicago Corp.*, 870 F.2d 356, 359 (7th Cir. 1989). In order to survive a summary judgment motion, the complaint and filings supporting it must allege specific facts regarding the circumstances from which the existence of the relationship can be inferred. The

5

party alleging an agency relationship has the burden of proving it. *Matthew Roofing v. Community Bank & Trust*, 550 N.E.2d 1189, 1193, 194 Ill. App. 3d 200, 204 (1st Dist. 1990).

## INDEPENDENT CONTRACTOR VERSUS EMPLOYEE

The Illinois Supreme Court in *Postal Tel. Sales Corp. v. Industrial Comm'n*, 37 N.E.2d 175, 177, 377 Ill. 523, 525 (Ill. 1941) set out the Illinois law applicable in determining whether a person is an independent contractor or an agent. The court defined an independent contractor as one who renders service in the course of the occupation, and represents the will of the person for whom the work is done only with respect to the result, and not the means by which that result is accomplished. *Id.* citing *Ferguson & Lange Foundry Co. v. Industrial Comm'n*, 179 N.E.2d 86, 89, 346 Ill. 632, 636 (Ill. 1943). Where one undertakes to produce a given result without being in any way controlled as to the method is which he attains it, he is considered an independent contractor rather than an employee. *Id.* Various courts have noted, however, that the determination of whether a plaintiff is an independent contractor or an employee is a difficult task. This is because both relationships share similar elements and no specific rule has been adopted by Illinois courts applicable to the facts of all cases. While no one factor determines this issue outright, courts have cited several which they consider to be prominent in their determination. In *Mazzei vs. Rock-N-Around Trucking, Inc.*, 246 F.3d 956 (7th Cir. 2001) the court applied a 5 factor analysis in determining the issue of one's employment status. Those factors are:

> (a)  The extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work,
>
> (b)  The kind of occupation and nature of skill required, including whether skills are obtained in the workplace,

6

(c) Responsibility for the costs of operation such as equipment, supplies, fees, licenses, workplace, and maintenance of operations,

(d) Method and form of payment and benefits, and

(e) Length of job commitmentt and/or expectations.

*Mazzei*, citing, *Knight v. United Farm Bureau Mutual Insurance*, 550 F3d, 377, 7th Cir. 1991)

With this criteria in mind we review the evidence. It is clear that the defendant was allowed a great deal of independence in performing his job, however plaintiff exerted a certain amount of control over the manner in which the defendant operated as well. Plaintiff assigned the defendant to cover a given territory and pursue sales within that area. In fact, upon starting his new position in 1994, the defendant was given the names and accounts of several customers the plaintiff already did business with in Wisconsin. Defendant, however, maintained his own work schedule. He was asked to call in daily to the main headquarters to check for sales calls that arrived throughout the day, but he was not required to report in on a daily basis, the company maintained no records of any sales calls the defendant made, he did not have to record the hours he worked and had no set hours for which he was required to work. Nor was defendant subject to any vacation policy. He could take off days from work whenever he wished.

Midwest Ink controlled the prices of the product being sold. In his deposition, defendant himself testified that he sold ink at prices designated by the owners of Midwest Ink. However, the defendant was authorized to deviate from the company's standard pricing index and sell at a lower price, if necessary to make a sale, and he testified that he would have to check

7

with officials at the head office before completing such a deal. The defendant points out that he was never formally trained noting that the plaintiff had no employee manuals providing any written instruction as to how to conduct a sale nor any written company policies referring to he must conduct himself. On the other hand, the president of Midwest Ink testified that upon initial hire, he personally trained the defendant over the course of more than a year in his sales technique, accompanying him on seven or eight sales calls.

Defendant further argues that the fact that he and his father were paid solely on commission indicates his employment status as an independent contractor. While no decision of any Illinois court has been cited as applying to salesmen working upon commission, this does not mean that all commission salesmen are independent contractors, as each case depends upon the facts. *See Postal Tel. Sales Corp.*, 37 N.E.2d at 178, 377 Ill. at 529 (referring to the importance of the particularities of each case in determining employment status). Three decisions of the Appellate Court involving negligence claims held the relationship created was that of independent contractor and not of employee. *See Meece v. Holland Furnace Co.*, 269 Ill. App. 164, 166 (3d Dist. 1934); *Burster v. Nat. Refining Co.*, 274 Ill. App. 104, 106 (2d Dist. 1934); *Trust v. Chicago Motor Club*, 276 Ill. App. 289, 293 (2d Dist. 1934). In all of these cases, there was cooperation between the contracting parties, but not such as to give control over the details of the particular job. Additionally, the injured parties in these cases furnished their own instrumentality for doing business and covering a given territory.

In this case, the plaintiff provided the defendant with a furnished office complete with ink mixing machines and storage facilities in Wisconsin. The plaintiff paid for the upkeep

8

of the office, including all taxes, telephone, and utility expenses. The property lease agreement for the office and the city building occupancy certificate support the plaintiff's theory. Both documents list Midwest Ink as the tenant, not the defendant. Also, the monthly rent and the charges for the city certificate were submitted and paid for by Midwest Ink. The president of the company also testified that all supplies necessary to the manufacturing and storage of ink at that office were incurred by Midwest Ink. Of importance also is the fact that the company provided the defendant with a 1991 Ford Taurus. The defendant, however, testified that he was responsible for fuel costs and minor maintenance costs and, according to the president of Midwest, at the end of the day the plaintiff paid all his own expenses. Based on those facts, it is clear that while the plaintiff provided many of the tools, and much material, and equipment necessary for the defendant to perform his task, the defendant shared in the expense of providing these items to some extent. He was responsible for his own expenses in making his sales calls.

The evidence also shows the relationship of the defendant's work to the plaintiff's business and demonstrates that the defendant's work was an essential part of the company's entire revenue. Plaintiff supplied materials and the space for the storage of the company's ink products. Defendant's sale of that product provided a necessary part of the plaintiff's business operations and, therefore, cannot be viewed in any way as separate and apart from them. Also, evidence presented by both sides indicates that the defendant was a successful salesman, and prior to the formation of Graphic Ink, provided the plaintiff with a substantial portion of their total revenue. Moreover, the defendant and his father were solely responsible for sales in Wisconsin and thus the business depended on them for any revenue coming from that territory.

Also of importance is evidence relating to the defendant's W-2 forms. There is no dispute that the plaintiff did not withhold any taxes from defendant's weekly paychecks as one might expect it to do with an employee, although this factor is not controlling. *See Ragler Motor Sales v. Industrial Comm'n,* 442 N.E.2d 903, 906, 93 Ill.2d, 66, 69 (Ill. 1983). Further, the defendant was paid solely on commissions earned. He received no salary and he received both W-2 and 1099 forms from the plaintiff. 1099 forms are ordinarily used to report the income of non-employees. In addition when he began he was to work only part time for Midwest Ink. However, on his income tax returns, the defendant specifically listed himself as an employee of Midwest Ink. Furthermore, the only income the defendant reported on his tax returns for 1994-1997 was from Midwest Ink. Such evidence tends to indicate that the defendant himself viewed the relationship as one of employer-employee.

The fact that plaintiff paid worker's compensation for the defendant, deducted from his salary the costs of FICA and health insurance also indicates employee status. Illinois courts have found that evidence of worker's compensation insurance deductions from an employee's gross revenues is a weak indication that a claimant was an independent contractor. *Earley v. Industrial Comm'n,* 553 N.E.2d 1112, 1116, 197 Ill. App. 3d 309, 312 (4th Dist. 1990). Additionally, courts have placed importance on whether a claimant shares in a company's insurance benefits. *See Peesel v. Industrial Comm'n,* 586 N.E.2d 710, 715, 224 Ill. App. 3d 711, 718 (1st Dist. 1992); *Postal Tel. Sales Corp.*, 37 N.E.2d 175, 180, 377 Ill. 523, 531 (Ill. 1941). In the instant case, the defendant was insured through the plaintiff's group insurance plan. He and his wife participated in the benefits of that coverage. Indeed, the plaintiff's employee roster given to the

health carrier indicates the defendant as an "employee" and thus entitled to insurance coverage. Furthermore, the defendant himself indicated on his signed insurance application that he was an "employee" of Midwest Ink. He also testified that he was assured by the company and its insurance provider that he and his wife were covered by the company's health insurance policy due to his employment status.

Finally, in his affidavit defendant claims that he also sold for another company, Graphic Sciences. Yet there is no income reported by defendant to support this assertion. In spite of the fact that the defendant's express description of the relationship indicates an employee-employer relationship, there is sufficient contradictory evidence to create an issue of fact.

## CONCLUSION

Thus, as to several of the critical considerations listed in *Mazzei*, namely, the extent of the employer's control and supervision over the worker, whether the worker's skill was obtained in the workplace, responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace and maintenance of operations, and method and form of payment and benefits, the evidence is in substantial conflict. For these reasons the defendant's motion for reconsideration is granted and the court's summary judgment ruling of March 19, 2001 is hereby vacated.

## DEFENDANT'S MOTION FOR SANCTIONS

Defendant has also moved this Court to impose sanctions on plaintiff and its counsel for their conduct in violating this Court's Standing Order relating to settlement conferences, for

11

failure to participate in the December 5, 2002 settlement conference in good faith, and for multiplying these proceedings unreasonably and vexatiously. In support, defendant points out that plaintiff failed to submit a written itemization of damages and settlement demand, failed to have parties with ultimate settlement authority personally present at the conference, and violated the letter and spirit of the Standing Order by failing to prepare for and meaningfully participate in good faith in the settlement conference.

Although we sympathize with defendant's position we find an insufficient basis in our review of the events surrounding the settlement conference to support an imposition of penalties upon plaintiff or his counsel. What actually happened is clear, even if the cause is not. Plaintiff, after having requested and gained a specific continuance of the settlement conference for the convenience of plaintiff's lead counsel, nevertheless appeared at the continued hearing date with co-counsel who had never before been active in the case. Represented at the first settlement conference by this substitute attorney, plaintiff indicated by both words and mannerisms, after much discussion, that it found the defendant's settlement offer at the conference reasonable and would seriously consider accepting it or some minor variation thereof in settlement of this case. However, when the settlement conference was reconvened, plaintiff appearing now by lead counsel, strongly rejected the settlement offer previously tendered. This reversal in attitude certainly took both the court and defendant by surprise. Indeed, had this attitude been voiced initially at the first settlement conference, the second conference would never have been scheduled. It appears that much of the time expended in discussing defendant's offer at the first conference could have been put to better use by all concerned if plaintiff had only indicated its

12

true intentions, as expressed at the second conference, at that time. Certainly, all of the time and energy expended in scheduling, preparing for and attending the second conference could have been avoided had plaintiff clearly expressed its intentions at the first conference. In short, it appears that the court and the defendant wasted much time and energy on the basis of plaintiff's expressions of interest in the offer being presented by defendant only to have plaintiff ultimately announce that it had no real interest in accepting such an offer. Whether this inconsistency on the part of the plaintiff was intentional or the result of a total lack of preparation and/ or communication between co-counsel, we cannot say. But without doubt it has caused a great deal of misunderstanding and a great waste of time and effort by all concerned. However, we're not prepared to assume at this time that plaintiff was being dishonest with the court. Nor, can we be sure that the waste of the court's time and resources was the result of plaintiff's juggling of attorneys and/or lack of preparation. We can not deny the possibility that the plaintiff simply had a good faith change of heart between conferences. Therefore we do not deem it appropriate to impose sanctions.

SO ORDERED

ENTERED: February 10, 2003

HON. RONALD A. GUZMAN